## Case No. 10,120.

### The NEPTUNE.

[Olcott, 483; 16 Hunt, Mer. Mag. 603; 5 N. Y. Leg. Obs. 293.] [1]

District Court, S. D. New York. Feb. 27, 1847.

WITNESS—PARTY TO THE RECORD—COLLISION—BE-TWEEN STEAM AND SAIL—PRECAUTIONARY MEAS-URES—LIGHTS—CONFLICTING TESTIMONY — MAS-TER AND CREW WITNESSES FOR OWNER.

1. In actions in the federal courts, parties to the record cannot be examined as witnesses.

2. The federal courts will, upon motion and for good cause shown, authorize the name of a party to be stricken from the pleadings; and he can then be examined as a witness, subject to all legal objections.

3. Sailing vessels meeting steamers at sea must use due precautions to avoid coming in collision with them, as for example by taking care not to impede their course or embarrass their navigation.

4. In an action for damages incurred to a sailing vessel through collision with a steamboat, the libellants must prove the sailing vessel clear of all culpable conduct conducing to the collision. Steamers are not bound to guard sailing vessels against their own misconduct. It is the duty of a steamer to take prudential measures in ample season for avoiding a sailing vessel. when the two are approaching.

[Cited in The New Champion. Case No. 10,-146; The Rocket, Id. 11,975.]

5. Sailing vessels are not bound to have lights suspended in the night time.

[Cited in The City of Savannah, 41 Fed. 893.]

6. The positive testimony of witnesses to their own acts, at the time of a collision, is entitled to outweigh the opinions and belief of out-numbering witnesses who judged of such acts from the opposite vessel.

[Cited in The Gray Eagle, Case No. 5,734; Nelson v. The Goliah, Id. 10,106; The Fannie, 11 Wall. (78 U. S.) 242.]

7. The master and crew of a vessel are competent witnesses for the owner of the vessel in a cause of collision.

This was a cause of collision. It came before the court upon the following pleadings: The libel and complaint of Zebulon Paine, owner of one-half part of the schooner Iola and owner of part of her cargo; Sarah Sherwood, owner of the other half part of the schooner; John Buchanan and Andrew Bradford, owners of part of the cargo; Joseph Sumner, master of the said schooner; James McCollin, mate; Ambrose Venelan, James Wooster, seamen; Henry Coff, cook; and Augustus Norten, a passenger on board of said schooner, allege that the said schooner Iola, on or about the 7th day of July, 1846, left the port of Eastport, in Maine, with a cargo of lathes, pickets, plaster, fish in barrels, and packages of money, bound for the port of New-York; that the schooner was tight and staunch and strong. and well manned and appointed; that in the evening of the 14th July she had proceeded about a mile to the

south of the light-boat stationed off the Middle Ground, a shoal nearly opposite to Stratford Point, and that the schooner passed the light-boat, being about a mile to the southward thereof; that the said schooner was then steering about a west course, the wind being nearly from the north; that the night was clear, and the said vessel could be easily discerned at a considerable distance; that whilst sailing upon her course about west, with a fresh wind, going from six to eight knots an hour, between nine and ten at night she was negligently run against and into by the steamboat Neptune, which was then proceeding down the Sound from the city of New-York, and run and struck against the hull of the said schooner between the fore and main rigging on her larboard side, with such great force and violence as to break and tear open the hull of said schooner, and cut her nearly in two, so that she filled and sunk almost immediately, and the said vessel and her cargo, and the clothes, money and effects of the crew and passengers, were totally lost, and a female named Murphy and her child, were drowned; that Long Island Sound, where the disaster occurred, is very wide, and there was ample room for the steamboat to have passed and avoided the schooner; that the schooner was worth three thousand dollars; that that part of the cargo belonging to the said Paine was of the value of $550: that the value of the cargo belonging to John Buchanan was $117; that the owners of the schooner lost the freight and passage money, &c., and the other libellants set forth their losses as by annexed schedules; they pray for a decree in their favor, for their damages and costs.

The respondent in his answer says, that as to the ownership of the schooner Iola, the cargo and the other subjects of property, he knows nothing, and therefore leaves it to the libellants to make out proof of their allegations. He further alleges that the steamboat Neptune, being in good order, sufficiently equipped and manned, sailed from New-York, 14th July, 1846, bound to Newport and Providence, in Rhode Island, and proceeding upon her passage at her regular rate, about one mile from Stratford light-boat, about nine or ten o'clock in the evening, a vessel was seen about one-half of a quarter of a mile ahead, which vessel was the schooner Iola. That immediately upon seeing the schooner, the course of the steamboat Neptune was changed to windward of the schooner, for the purpose of giving the said schooner the course she was then running. That when the said steamboat was about ten or twelve lengths from said schooner, it was observed that the latter had changed her course, and was luffing up so as to cross the bows of the said steamboat. That when first seen, said schooner was running north by south, from which she changed suddenly to about northwest. That on seeing that said schooner had changed her course, the bell of the steamboat was imme-

[1] [Reported by Edward R. Olcott, Esq. 16 Hunt, Mer. Mag. 603. and 5 N. Y. Leg. Obs. 293, contain only partial reports.]

diately rung to stop her, and all efforts made to avoid the collision; but the said schooner came directly across the bows of the said steamboat, and the latter having some headway, a collision could not be avoided. That said schooner was struck about midships, and her crew at once jumped from the rigging on board the said steamboat. That hearing that a female and child were left on the schooner, a small boat was immediately lowered from the Neptune, sufficiently manned, and every effort made to save any persons on board said schooner. That the captain of the steamboat, and the men with him who manned the said small boat, continued to row about the place of the disappearance of the schooner for more than half an hour, and finding no person needing their aid, they returned to the Neptune. That the master, pilot and wheelsman of the Neptune were experienced and skilful, and that the crew were not inexperienced, careless and incompetent men; nor was the steamboat carelessly, improperly or unskilfully navigated at the time; nor was the loss of the schooner and cargo, nor the lives of any persons, if any such were lost, occasioned by the fault, carelessness or unskilful management of the steamboat. That the reason why the said schooner was not seen earlier was that a heavy, black cloud shut her out from view, and she had no lights visible on board. That the change of the course of said steamboat threw the broadside of the Neptune to view from the schooner, so that the man at the helm on the schooner saw the head and stern lights of the steamboat, and her course was plainly seen by him. That the wind was blowing fresh, and the "luffing up" of the schooner so as to cross the bows of the steamboat, when the position and course of the latter was evident to those on board, could not have been expected by any person on board the steamboat, and was contrary to all proper and lawful rules of navigation. That the accident aforesaid was occasioned by the great negligence and want of care of the officers and crew of the schooner in not providing proper lights on deck, and in changing the course of the schooner right across the bows of the steamboat, and not by any negligence, want of skill or care of the officers and crew of the steamboat. Wherefore they pray that the libel be dismissed with costs. The matters in controversy under the pleadings relate to damages sustained by the owners of the schooner Iola, who are a portion of the libellants, and also by the owners of the cargo and property on board, who are the other libellants, in consequence of her destruction by collision with the steamboat Neptune. The master and crew of the Iola are co-libellants, who sue for property owned by them which was lost on board the schooner; and they were offered as witnesses on the hearing to prove the damages they had sustained, and the liability of the steamboat therefor. Exceptions to their competency having been taken on

the part of the claimants, the court permitted that question to be argued, preliminarily to the hearing of the cause upon the merits.

F. B. Cutting, on the part of the libellants, argued that the witnesses were competent ex necessitate, and also in conformity to the practice of admiralty courts in cases of wages and salvage. He cited 1 Greenl. Ev. 27; 12 Vin. Abr. 24, pl. 34; 12 Johns. 461; 6 Wend. 407, 409; 4 Wend. 483; 11 Wend. 568; 16 Wend. 595, 596; [M'Coul v. Lekamp] 2 Wheat. [15 U. S.] 111, 117 note; 2 Yeates, 254; [Seagrove v. Redman] 4 Dall. [4 U. S.] 153; 1 Greenl. Ev. §§ 348, 350; Dunl. Adm. Prac. 264; 2 Browne, Civ. & Adm. Law, 112; Dunl. Adm. Prac. 85, 89, 90; The Henry Ewbank [Case No. 6,376]; Bearse v. Three Hundred and Forty Pigs of Copper [Id. 1,193]; Dunl. Adm. Prac. 87; Betts, Adm. 57; 2 Hagg. Adm. 145.

L. B. Woodruff and George Wood controverted these positions, and cited [Oliver v. Alexander] 6 Pet. [31 U. S.] 143; 2 Browne (Pa.) 350; The Henry Ewbank [supra]; 2 Hagg. Adm. 154; Dunl. Adm. Prac. 264, 265; Thompson v. The Philadelphia [Case No. 13,-973].

BETTS, District Judge. The rule in equity established in the courts of this state does not disqualify a party named on the record from being a witness in the cause, if he has no certain interest in the event. 1 Johns. 556; 2 Cow. 186–189; 1 Johns. Ch. 550; 6 Johns. Ch. 212. Some of the judges in those cases were indisposed to consider a mere contingent liability to costs as amounting to a disqualifying interest; but the present chancellor seems to hold a party incompetent for that cause. 6 Paige, 565. At law the rule is clearly so, and the parties to the record, who are merely nominal, or who consent to be sworn, are not admissible as witnesses when objected to. 4 Johns. 140; 20 Johns. 142; 1 Wend. 20; 4 Wend. 453; 7 Cow. 650; 19 Wend. 353. The rule of disqualification because of connection with the suit is not so stringent in all the states. The cases upon the subject exhibiting the diversity of the law in this respect are collected in Cowen & Hill's notes to Phil. Ev. pp. 134–145, 1548; Greenl. Ev. § 347; but this court is not called upon to estimate their relative authority, or at liberty to discuss the question made as an open one. The supreme court of the United States has settled the law definitely, for all the national tribunals, that a party to the record is an incompetent witness in the cause. This is placed upon grounds of policy which do not admit of the exceptions recognized by other courts. De Wolf v. Johnson, 10 Wheat. [23 U. S.] 367, 384; Scott v. Lloyd, 12 Pet. [37 U. S.] 145; Stein v. Bowman, 13 Pet. [38 U. S.] 209. A party is held disqualified to testify in such cause, although his interest be nominal or entirely extinguished, or be protected by a deposit of money, equal

to any liability he may become subject to. Proceedings in maritime courts are governed by general rules applicable to cases at law and in equity, where no special course has grown up from long usage in those courts, or has not been appointed by positive law. The Boston [Case No. 1,673]. Prize causes and suits for salvage are prosecuted in the names of all parties interested in the recovery, and the suitors named in the pleadings are admitted as witnesses to sustain the action. This is put upon the ground of necessity; but it is also to be observed that those actions are founded in principles of public policy, and look to other results than the mere rights and rewards of individual suitors. They are equally anomalous in the permission to parties not having a common right and interest—on the contrary, often setting up interests hostile to each other—to unite in the same action, as in the admission of such parties to testify, not for each other alone, but each also for his personal interests. So by Act Cong. July 20, 1796, § 6, seamen are compelled to join in actions for wages earned in a common voyage, brought against the vessel; yet the suits are distinct and several, and have all the properties of actions prosecuted by parties independently of each other,—[Sheppard v. Taylor] 5 Pet. [30 U. S.] 714,—and the co-libellants, in such actions must accordingly be admissible witnesses for each other, as in separate suits. There is no common interest, even contingently, as to costs. If the decree be against the libel, one libellant is not chargeable with the costs incurred by the respondents on account of his co-libellant, and can only be made liable for those created by his individual claim. Neither the claim of necessity, of long usage and custom, or the appointment of positive law, applies to the position or quality of the witnesses offered in this case. They are not brought forward as indispensable parties in the cause, and who are the only witnesses present, and capable of giving evidence to the facts in question. They stand upon the record as common sufferers for a tort, and in that position are disabled from testifying for their associates. The case of The Catherine of Dover, 2 Hagg. Adm. 145, cited in support of the admissibility of these libellants to testify, stands on a different doctrine. The witnesses admitted in that case were not parties to the action, nor proved to be interested in its event. I think the objection ought to prevail, and that the libellants must be excluded as witnesses in the cause.

A petition being subsequently presented to the court, praying that the names of the master and crew of the schooner might be stricken from the record, an order to that effect was entered, and the testimony of these witnesses and other proofs were then offered in support of the allegations of the libel. The material facts will appear sufficiently in the opinion of the court.

George Wood and L. B. Woodruff, for claimants.

The burden of proof is on the libellants. The Iron Duke, 9 Jur. 477. The vessel complaining must be free from all blame. The Friends, 1 W. Rob. Adm. 485; Id. 488; 3 Car. & P. 531.

F. B. Cutting, in reply, for libellants.

The Neptune was palpably off her course; she must take the burden of accounting for her situation. The Perth, 3 Hagg. Adm. 417; Story, Bailm. §§ 608, 609, 611; 3 Hagg. Adm. 316; The Jupiter, Id. 320; 3 Car. & P. 528. Childs says he saw the schooner right ahead on her starboard, and he turned to windward. This was a violation of law. The H. B. Foster [Case No. 6,290]; Story Bailm. § 611; 3 Kent, Comm. 230; The Cynosure [Case No. 3,528]; Id., 3 Hagg. Adm. 320. The steamboat should have kept off to starboard. 1 W. Rob. Adm. 481; The Friends, Id. 487; The Shannon, Id. 467; The Cynosure [supra]; The Narragansett [Case No. 10,019]. If it was dark the Neptune was in fault in running at full speed. 3 Hagg. Adm. 417; Id. 176; [Stokes v. Saltonstall] 13 Pet. [38 U. S.] 181.

BETTS, District Judge. The importance which this controversy has assumed on account of the amount of loss incurred by the collision, and of the question of the right navigation of the respective vessels, has caused a more prolonged examination of testimony and a wider discussion at the hearing than would seem demanded by the intrinsic difficulties of the case. A sailing vessel and a steamboat running in opposite directions, came in collision on the Sound, in the night time. The injury was received chiefly by the schooner, which sunk directly after the collision. The libellants charge the act to have been wholly the fault of the steamer, and that they are entitled to full remuneration from her for their losses. The schooner is alleged to be worth $3,000, and the property on board her, totally lost, about $1,000. The particulars on which the action is grounded stated in the libel, are, that the schooner was on her passage from Eastport, Maine, to New-York, and on the night of July 14, 1846, was standing about west, running about six or eight knots the hour, the wind being fresh and nearly north, when, between nine and ten p. m., she was run into by the steamboat Neptune, proceeding down the Sound from the city of New-York. The schooner had passed the light-boat stationed on the middle ground nearly opposite Stratford Point, about one mile south of that boat. The night was clear, and the schooner could be easily discerned at a considerable distance from the steamer. The schooner was cut nearly in two by the collision, and sunk almost immediately; the vessel, cargo, clothes, money and effects of the crew and passengers were totally lost, and two passengers, a woman

and her child, were drowned. The libel alleges that the steamboat was carelessly, improperly and unskilfully navigated, and the disaster was occasioned solely thereby. That her crew, and those having her management, were inexperienced and incompetent, or else were careless or negligent; and that the disaster was occasioned without the fault of the schooner and her crew. The libellants are bound to prove their own conduct correct, both in what was done or omitted to be done on board their vessel. If their acts caused the collision, or essentially conduced to it, they must bear the consequences, and cannot call upon the steamer to contribute to their satisfaction, unless it appears she was equally in fault. The Catherine of Dover, 2 Hagg. Adm. 154; Id. 360. They must further show that the schooner was well found, manned and equipped for the navigation in which she was employed; and they have no exemption in any of these particulars because the injury was received from a vessel propelled by steam. The action is for a tort. The complaining vessel must appear clear of blame, and also prove fault or negligence on the part of the other directly leading to the disaster. The Ligo, Id. 356. The law in no way justifies the notion that steam vessels are burthened with the sole risks and responsibilities of encounters with sailing vessels. The rule is reciprocal, placing both classes of vessels under a common liability and privilege; except that steamers are regarded as always possessing the means of avoiding a sailing vessel with a free wind, with the additional advantage of being able to stop their headway or take a retrograde movement. Those means they are bound to employ to avoid a sailing vessel at anchor, or embarrassed in her position or movements, or when keeping her own course. This service is exacted of steam vessels in contribution to the common safety of navigation, and is due as well when a sailing vessel is under difficulties from the improvidence or unskilfulness of those managing her, as if brought upon her by mischance, or without fault on her part. A sailing vessel under way has no right to hold steamers approaching her, responsible under all circumstances, for her security against them. She has also an important duty to perform in preventing a collision. She must keep steadily the course she is running when near a steamer, or if she departs from it, the change must, if practicable, be made in a manner to aid the steamer in avoiding her. —

If in this case the defence set up is established, that the schooner, when too near for the steamer by any manoeuvre to escape her, luffed suddenly across the bows of the Neptune, and received the injury in that manner, the action cannot be sustained, and the claimants should be discharged from it with costs. Upon this fact the pleadings and proofs are in direct conflict. That issue embraces the substantial merits of the case.

The question upon the competency of the libellants' witnesses to testify in the cause will be afterwards noticed. Witnesses on the different vessels so habitually disagree in their opinions of the immediate or remote causes of a collision at sea, and of the incidents of the occurrence observed on both sides at the same time, that courts can place little confidence in their expressions of opinion, and can rarely feel it prudent to decide causes of collision upon testimony of that character. Receiving with great distrust, the opinions and judgments of witnesses so circumstanced, however intelligent and worthy the individuals may be, the court looks chiefly to facts stated by witnesses to have occurred within their personal knowledge. What a witness asserts he did at the time or did not do on his own vessel, is generally more satisfactory evidence of the fact than the opinions and belief of a dozen others, formed from what they supposed they saw or heard on another vessel.

(The court here analyzed and collected carefully the testimony of the various witnesses; but it is not deemed necessary to the clear apprehension of the principles of this decision to report that part of the opinion.)

The men on the deck and the one at the wheel of the schooner all testify positively that no movement of her helm or change of her course was made when the steamer was coming upon her. The effort of the claimants is to prove that the schooner suddenly luffed after the steamer had starboarded her helm and was going clear of her, and was thus thrown across the bows of the Neptune after it was too late for the latter to take any further measures to avoid her. It is to be remarked that no witness on the steamer says he observed any change of the schooner's course until the wheel of the Neptune had been starboarded, and she began coming up to the wind. This movement, in a moment of alarm and the obscurity of the night, might easily have been attributed to the schooner, so that the latter would seem to the witnesses to be luffing, when her broadside was brought to view only because of a change of direction by the steamer. I hold it is not proved upon this evidence that the schooner was guilty of any fault or neglect in her movements, conducing to the collision.

Only one other fact respecting her conduct need be noticed. It is alleged that the schooner was concealed from the view of the Neptune by a thick black cloud, hanging over the eastern horizon, and that under those circumstances it was a fault on her part to run without exhibiting a light as a warning to vessels approaching her. I shall not discuss the evidence upon this subject for the purpose of determining the degree of darkness occasioned by that state of the atmosphere. The witnesses differ widely in their estimates of that fact; but admitting the sky was in places or wholly overcast, di-

rectly before or at the time of the collision, the darkness is not proved to have been so dense as to prevent the schooner being seen far enough from the steamer to afford time to the latter to take precautions for avoiding her. The witnesses on the steamer state facts which afford a strong presumption that the schooner was in plain sight in sufficient time for the pilot to have stopped and backed the engine of the Neptune before the vessels came together; and it was a plain neglect of his duty not to take that precaution. 2 Hagg. Adm. 173; 3 Hagg. Adm. 414. There was, besides, a blameable want of prudence in the pilot in running the steamer at her full speed, if the obscuration of the sky was as great as he represents it to have been; and above all, there was culpable remissness in not placing a competent watch upon the forward deck, in a position giving the best advantage for a thorough look-out ahead. These were acts of gross carelessness, and of a character in themselves to cast upon the steamer the responsibility for the collision. I only add, in respect to the relative positions of the two vessels, that in my judgment the decided weight of evidence is that the Neptune was on a track to the south and leeward of the schooner, when her wheel was starboarded and her head veered to the north. This was a violation of nautical rules, and such want of care and skill as to render the steamer responsible for the consequences which followed. The Friends, 1 W. Rob. Adm. 478. The question of the competency of the master and crew of the schooner to testify for the libellants in the cause was incidentially adverted to in the decision upon the motion to exclude them because parties to the record. The point has been presented again to the attention of the court on this hearing, and after their names had been stricken from the pleadings. Witnesses of this class it would seem were always regarded as admissible in admiralty in causes of collision, although intimations are thrown out that it may be proper to take releases to obviate final objections. 3 Hagg. Adm. 323. I see no necessity for this. The witnesses stand merely in the relation of servants and agents to the owners of the ship and cargo, acting within the plain scope of their authority. That character does not render them incompetent witnesses for their principal when he is a party to the suit. 1 Greenl. Ev. § 416; 1 Phil. Ev. 56, Cowen & Hill's Notes, p. 1525.

The decree in this cause will accordingly be in favor of the libellants for the whole value of the schooner and cargo, with costs.

---

NEPTUNE, The (BROWN v.). See Case No. 2,022.

NEPTUNE. The (COULON v.). See Case No. 3,273.

NEPTUNE, The (JOLLY v.). See Case No. 7,439.

NEPTUNE, The (PAINE v.). See Case No. 10,120.

NEPTUNE, The (UNITED STATES v.). See Case No. 15,865.

NEPTUNE. The (WALTON v.). See Case No. 17,135.

NEPTUNE, The (WHITEMAN v.). See Case No. 17,569.

NEPTUNE INS. CO. (BRADSTREET v.). See Case No. 1,793.

NEPTUNE'S CAR, The (DOOLEY v.). See Case No. 3,997.

END OF CASES IN BOOK 17.